UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JULIE SU, Acting Secretary of Labor, United States Department of Labor, | ) | |
| Plaintiff, | ) | No. 23 C 4983 |
| v. | ) | Judge Hunt |
| COMMITTEE FOR FAIR & EQUAL REPRESENTATION, | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN**
**<u>SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

The Plaintiff, the Secretary of Labor, seeks a judgment voiding the January 7, 2023, election of officers conducted by the Committee for Fair and Equal Representation (CFER) (Defendant or Union) for violating Title IV of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA or Act), 29 U.S.C. §§ 481-483, and directing Defendant to conduct a new election for the offices of President, Vice President, and Recording Secretary under Plaintiff's supervision, and for other appropriate relief.

Section 401(e) of the LMRDA states that "Each member in good standing shall be entitled to one vote." 29 U.S.C. § 481(e). In a mail ballot election, a union's duty to ensure a reasonable opportunity for each member to vote means that it must maintain an accurate mailing list, and this duty includes taking steps to correct known bad addresses. The Union failed to meet this requirement when it took no steps to update addresses for members whose ballots were returned undeliverable. Additionally, Section 401(c) requires the union to provide "adequate safeguards to insure a fair election." 29 U.S.C. § 481(c). One such safeguard is that members must receive adequate voting instructions. The Union failed to provide adequate

voting instructions, resulting in members' votes being disqualified at the ballot tally. Accordingly, this Court should grant Plaintiff's motion for summary judgment and order Plaintiff's requested relief.

**Factual Background**

The Union is a local labor organization engaged in an industry affecting commerce within the meaning of sections 3(i), 3(j), and 401(b) of the Act, 29 U.S.C. §§ 402(i), (j), and 481(b), and its officer election was covered by Title IV. Secretary of Labor's 56.1 Statement ¶ 1. Defendant is the collective bargaining representative for approximately 300 security guards employed by Paragon Systems (Paragon) who work in federal office buildings throughout Illinois. *Id.* ¶ 2. The Defendant's regularly scheduled election of officers was held on January 7, 2023. *Id.* ¶ 3. A nomination notice was emailed to all members on October 24, 2022. *Id.* ¶ 4.

The Union appointed an Election Committee, which was responsible for overseeing the election process and ensuring that the election was run in accordance with all legal requirements and the Union's bylaws. *Id.* ¶ 5. The Election Committee was provided with copies of the Union Bylaws and "all of DOL's guidelines (booklet) and material to follow throughout the process for the election." *Id.* ¶ 6. Sheron Dixon-Stevens was selected as the chairperson of the Election Committee. *Id.* ¶ 7. The Union hired Election Source to conduct the mailing of the ballots and the tally of the ballots at the conclusion of the election. *Id.* ¶ 8. To facilitate the ballot mailing, the Election Committee sent Election Source a mailing list with members' names and addresses that the Union had obtained from Paragon. *Id.* at ¶ 9. The Election Committee did not take any steps to confirm the accuracy of members' addresses on the list it obtained from Paragon. *Id.* at ¶ 10. Election Committee Chair Dixon-Stevens asserted that the

Committee had "no control" over the employee list and that it was the members' responsibility to update their addresses with the employer. *Id.* at ¶ 11.

The ballots were mailed on or about November 30, 2022. *Id.* at ¶ 12. Ballots that were undeliverable were returned to Election Source. *Id.* at ¶ 13. Prior to the start of the election, Election Source had been instructed to inform the Election Committee of any mail that came back as undeliverable. *Id.* ¶ 14. During the course of the election, Steve Panoff, who works for Election Source, would e-mail Sheron Dixon-Stevens, the Union's Election Committee Chair, to let her know that a ballot was returned as undeliverable and the address that was on the undeliverable ballot. *Id.* at ¶ 15. Dixon-Stevens received Panoff's emails but made no effort to contact these members or otherwise locate new addresses for the undeliverable ballots. *Id.* at ¶ 16. The only new addresses she emailed to Election Source were from members who had affirmatively reached out to the Union to request a duplicate ballot. *Id.* at ¶ 17. Dixon-Stevens did not believe it was the Election Committee's job to find new addresses for members whose ballot packages were returned as undeliverable. *Id.* at ¶ 18. At least 21 ballots were returned as undeliverable by the date of the ballot tally. *Id.* ¶ 19. Of those 21 members whose ballots were undeliverable, 11 requested duplicate ballots. *Id.* ¶ 20. Of the remaining 10 members, 8 were eligible to vote but never received a ballot. *Id.*

The ballot tally was conducted on January 7, 2023. *Id.* ¶ 21. During the tally, the Election Committee made the decision to void ballots that were returned without a return address on the outer business reply envelope. *Id.* ¶ 22. The business reply envelopes that members were instructed to use when returning their voted ballots were pre-printed with the members' names and addresses in the return address space in the original ballot package mailing. *Id.* ¶ 23. However, the return ballot envelopes in the duplicate ballot packages were

not pre-printed with the members' return address, they were blank envelopes. *Id.* ¶ 24. The duplicate ballot package did not contain any instructions that voters must write a return addresses on the return ballot envelope or that failure to do so would result in a voided ballot. *Id.* ¶ 25. The voting instructions simply said, "Place the completed ballot into the 'BLUE ENVELOPE' and seal. Then place the 'BLUE ENVELOPE' into the 'BUSINESS REPLY ENVELOPE' provided and seal." *Id.* ¶ 26. Defendant believed that "it was common sense" for voters to put their return address on the return ballot envelope.[1] *Id.* ¶27. Upon its review of the election records, the Department found that 13 eligible voters had their ballots voided because the voter did not write out their name and address on the Union-provided ballot return envelope. *Id.* ¶ 28. At the conclusion of the ballot tally the race for President was decided by 12 votes, the race for Vice President was decided by 14 votes, and the race for Recording Secretary was decided by 5 votes. *Id.* ¶ 29.

## Argument

### I. Legal Standard for Summary Judgment

Although section 402(c) of the LMRDA provides for relief "after a trial upon the merits," summary judgment may be awarded in a case brought pursuant to that section so long as the standard Rule 56 requirements are met. *Brennan v. Local Union 639, Teamsters*, 494 F.2d. 1092, 1096 (D.C. Cir. 1974). Accordingly, summary judgment is appropriate if the evidence of record shows there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must view all evidence in the light most favorable to the nonmoving party and draw all inferences in the

[1] Plaintiff requests the Court take Judicial Notice of the fact that it is not a requirement to fill out a return address when sending mail through the U.S. Postal Service. https://pe.usps.com/BusinessMail101?ViewName=ReturnAddress.

nonmovant's favor. *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir. 1990). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has produced evidence to show that it is entitled to summary judgment, the nonmoving party must affirmatively demonstrate that a genuine issue of material fact remains for trial. *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). A genuine issue of material fact is not shown by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, nor by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252.

**II. The LMRDA Requires Democratic and Scrupulously Fair Elections**

The LMRDA was enacted to promote fair and democratic practices in unions. *See Wirtz v. Hotel, Motel & Club Emp. Union, Local 6,* 391 U.S. 492, 497-98 (1968) ("Local 6"); *Hodgson v. District 6, United Mine Workers of America*, 474 F. 2d. 940, 947 (6th Cir. 1973). Through the Act, Congress sought to "protect the rights of rank-and-file members to participate fully in the operation of their union through processes of democratic self-government and through the election process." *Local 6*, 391 U.S. at 497. Recognizing that free and fair elections were essential to union self-government, Congress enacted the safeguards of Title I and Title IV of the LMRDA "to provide a fair election and to guarantee membership participation." *American Federation of Musicians v. Wittstein,* 379 U.S. 171, 182 (1964); *see also Wirtz v. American Guild of Variety Artists*, 267 F. Supp. 527, 544 (S.D.N.Y. 1967) (unions must "conduct democratic and scrupulously fair elections").

Importantly, intent to violate the Title IV is not required, as the LMRDA operates as a strict liability statute. Thus, whether a union's Title IV violation is purposeful or inadvertent is not relevant. Defendant may not rebut the alleged violations by claiming to have acted in good faith. *See Reich v. Fed'n of Catholic Teachers, Inc.,* 853 F. Supp. 710, 714-15 (S.D.N.Y. 1994) (not necessary for section 401(c) violation that act was "committed purposefully or with malice") (citing 29 C.F.R. § 452.110); *DeArment v. Local 563, Laborers Int'l Union of N. Am., AFL-CIO*, 751 F. Supp. 1364, 1365 (D. Minn. 1990) (failure to remove deceased candidate's name from ballot violated adequate safeguards requirement "[d]espite the best intentions of the union"); *Donovan v. Graphic Arts Int'l Union,* 1984 WL 49068, at *8-9 (C.D. Ill. Aug. 3, 1984) (court may find violation regardless of whether "bad faith or knowing violation" or "inadvertent violation.").

In this case, the Department found that CFER committed multiple violations of Title IV, which denied at least 21 members in good standing their right to vote. Although CFER may assert that it conducted its election with the best intentions and made good faith efforts to conduct a fair and democratic election, as explained above, CFER's intentions and motivations are not relevant to a court's analysis of these statutory violations and do not constitute a recognized defense under well-settled Title IV legal precedent.

## III. Defendant Violated 29 U.S.C. § 481(e) by Failing to Maintain an Accurate Membership Mailing List and Failing to Take Reasonable Steps to Correct Known Bad Addresses on Undeliverable Ballot Packages.

Section 401(e) of the LMRDA states that "[n]ot less than fifteen days prior to the election notice shall be mailed to each member at his last known home address," and requires that "every member in good standing. . . shall have the right to vote" in the election. 29 U.S.C. § 481(e). A union's duty to maintain a current mailing list is a prerequisite to its statutory obligation to mail notice of the election. *Chao v. Local 54, Hotel Emps. & Rest. Emps. Int'l Union*, 166 F. Supp. 2d

109, 115 (D.N.J. 2001). The union bears the burden of proving that it has taken reasonable efforts to maintain an accurate mailing list. *Chao v. Local 290, Plumbers, Steamfitters, Pipefitters & Marine Fitters of the United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Industry of U.S. & Canada*, Civ. No. 06-1359-AC, 2008 WL 920337, at *4 (D. Or. Apr. 1, 2008) (citing *Reich v. District Lodge 720*, *Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO*, 11 F.3d 1496, 1501 (9th Cir. 1993)).

A union's duty to maintain an updated and accurate membership mailing list for purposes of sending notice of the election also impacts the union's statutory obligation to provide all members in good standing with an opportunity to vote in a mail ballot election. As the Department's regulations explain, the statutory right to vote "implies that there must be a reasonable opportunity to vote," and so "there is an obligation on the labor organization to conduct its periodic election of officers in such a way as to afford all its members a reasonable opportunity to cast ballots." 29 C.F.R. § 452.94.[2] Courts have construed this provision to require, at a minimum, that each member eligible to vote be given a "reasonable opportunity" to exercise his or her franchise. *Local 54*, 166 F.Supp.2d at 120; *see also Donovan v. Local 10902, Communications Workers of America*, 650 F.2d 799 (5th Cir. 1981); *Dole v. Graphic Communications Int'l Union*, 722 F. Supp. 782 (D.D.C. 1989); *Marshall v. American Postal Workers Union*, 486 F. Supp. 79 (D.D.C. 1980); *Hodgson v. Local Union 582*, 350 F. Supp. 16 (C.D. Cal. 1972).

In a mail ballot election, the duty to ensure a reasonable opportunity to vote means that a Union has an obligation to maintain an accurate mailing list so that members are not denied the

[2] The Secretary's interpretive regulations are not binding, but courts rely on them as persuasive aids in interpreting the provisions of Title IV of the LMRDA. *See, e.g.*, *BLE Int'l Reform Comm. v. Sytsma*, 802 F.2d 180, 190 (6th Cir. 1986).

right to vote because they did not receive their ballot. *Local 54*, 166 F.Supp.2d ("By failing to take reasonable steps to [] insure eligible members received ballots, the union disenfranchised a significant segment of its members in good standing and thereby violated Section 481(e) of the LMRDA."). A corollary to the rule that a union must take reasonable steps to maintain current mailing addresses is that, when a union learns that it has mailed a ballot to an incorrect address during the course of an election, it must take reasonable steps to find the member's updated address. *See Perez v. Amalgamated Transit Union Local 1700 (ATU 1700)*, 174 F. Supp.3d 395, 404, 408 (D.D.C. 2016).

While the statute does not require perfection in the union's mailing list, it does require that the union take "'reasonable steps' to ensure that each member in good standing is given a fair opportunity to vote." *ATU 1700,*174 F.Supp.3d at 402, 404. In *ATU 1700*, the court found that it was unreasonable for the union to not forward undeliverable ballots to addresses provided by USPS, even if those addresses were expired. *Id.* at 404. As one court explained, it did not matter that the union "successfully mailed ballots to over ninety-nine percent of its eligible voting membership" since this "does not excuse the Union from taking reasonable steps to ascertain a correct address for a member whose mail was returned as undeliverable." *Local 290*, 2008 WL 920337, at *4.

What constitutes "reasonable steps" to update members' addresses is fact specific. In this case, the Department determined, consistent with the courts that have evaluated this question, that it was unreasonable for the Union to take no action to obtain current addresses for members whose ballots the Union knew had been returned as undeliverable. *See, e.g.*, *ATU 1700*, 174 F.Supp.3d at 406 ("the unreasonableness of Local 1700's inaction here is compounded by its complete lack of effort to determine the members' updated addresses."). Here, there is no dispute that the Election

Committee took no action to confirm the accuracy of the mailing list provided by Paragon and later took no action to take reasonable steps to find updated addressed for members whose ballots were being returned as undeliverable and forwarded to the Committee. Plaintiff's 56.1 Statement ¶¶ 10-11.

Throughout the Department's investigation, the Election Committee has maintained the position that it was the members' responsibility to keep their addresses updated and to seek a duplicate ballot if they did not receive their ballot in the mail. *Id.* ¶ 11. The Election Committee is not correct, as it is the union's burden to take reasonable steps to maintain an updated and accurate membership list and to ensure its members are provided an opportunity to vote in the election. As in *Local 290*, the undisputed facts reveal that CFER cannot carry its burden of demonstrating that it took reasonable efforts to ensure its members' right to vote with regard to the known undeliverable ballots. *See* 2008 WL 920337, at *4 (finding support for the Title IV violation when union staff testified that "there was not any set policy" for finding a new address when mail was returned as undeliverable).

The Union asserts that the Election Committee was provided with all "DOL guidelines" for conducting a union officer election. Ex. A at ¶¶ 2, 8. Further, the Union argues that "the Election Committee had no instruction as to find correct addresses and was not able to find it in the DOL election rules as to where or how they had to obtain new addressed for returned mail." Ex. A at ¶ ¶ 10. The Department's Office of Labor-Management Standards ("OLMS') manual titled Conducting Local Union Officer Elections, which is publicly available on its website, contains instructions for election notices[3] and mail ballot elections. *See Conducting Local Union Officer*

[3] The Union did not mail an election notice as described by 403(e). 29 U.S.C. § 481(e). However, because this was a mail ballot election and the ballots were mailed more than 15 days prior to the due date, the Department would consider the ballot package itself to be the notice of election, subject to the same requirements as a separate election notice. *See Conducting Local Union Officer*

*Elections* (July 17, 2020). https://www.dol.gov/agencies/olms/compliance-assistance/publications/guide-for-conducting-local-union-officer-elections#ch10. For example, the manual states that "In order to comply with the election notice requirement, the union must make a reasonable effort to update its membership address list prior to the election." *Id.* The manual further explains that "if any election notices are returned undelivered, election officials should attempt to obtain accurate addresses and remail these notices promptly." The section explaining how to properly conduct a mail ballot election similarly explains that the union must:

> Update the union's membership address list to insure that the address for each member is correct. Review the union's most recent mailing to all members to determine if any pieces of mail were returned undelivered, make a list of members for whom new addresses are needed, and attempt to obtain updated addresses for those members.

*Id.* This guidance was public and available to the Union for reference. And while this guidance is not legally binding, it simply provides a detailed discussion of those statutory duties to which the Union was already bound.

The undisputed facts establish that the Union made no attempt to find accurate addresses for members who had their ballots returned undeliverable during the election period. The Union's failure to take reasonable steps to ensure members received their ballots resulted in a violation of Section 401(e) of the Act which denied eight members the right to vote. 29 U.S.C. § 481(e).

### IV. CFER Failed to Provide Adequate Safeguards, in Violation of 29 U.S.C. §481(c), When it Failed to Provide Adequate Voting Instructions, Resulting in Voided Ballots.

Among the protections in Title IV of the LMRDA is section 401(c)'s requirement that

---

*Elections* (July 17, 2020), https://www.dol.gov/agencies/olms/compliance-assistance/publications/guide-for-conducting-local-union-officer-elections#ch10 ("In a mail ballot election, no separate election notice is necessary if the ballot package is mailed at least 15 days prior to the date by which ballots must be mailed back in order to be counted and the instructions for marking and returning ballots are clear and complete.").

"adequate safeguards to insure a fair election shall be provided. . . ." 29 U.S.C. 481(c). Under this requirement, "[a] labor organization's wide discretion regarding the conduct of elections is thus circumscribed by a general rule of fairness." 29 C.F.R. § 452.110. Pursuant to the adequate safeguards provision, unions must conduct their elections in a manner that does not violate the fundamental precepts of fairness that are essential to the selection of leaders through a democratic electoral process. *See Donovan v. Graphic Arts Int'l Union*, 118 L.R.R.M. 2092, 2096 (C.D. Ill. 1984).

The legislative history of section 401(c) reveals that this language was intended to be construed broadly. The Senate's bill had limited the concept of adequate safeguards by the words to "insure a fair count of the ballots." *See* S.1555, 86th Cong., 1st Sess., 105 Cong. Rec. 40 (1959). However, the broader language of the House's bill was adopted, which required "adequate safeguards to insure a fair election." *See* H.R. 8342, 86th Cong., 1st Sess., 105 Cong. Rec. 14,536 (1959). By adopting the broader language, Congress intended to apply a general rule of fairness beyond the mere mechanics of balloting. *See* 105 Cong. Rec. 19,764 (1959) (statement of Senator Goldwater). That is also consistent with the view expressed by the Supreme Court that "Title IV's special function in furthering the overall goals of the LMRDA is to insure a 'free and democratic' election." *Local 153, Glass Bottle Blowers Ass'n*, 389 U.S. at 470.

The Department of Labor's regulations, 29 C.F.R. § 452.110(a), adopt that broad view of the adequate safeguards provision of section 401(c). It states:

> [T]he Act contains a general mandate in section 401(c), that adequate safeguards to insure a fair election shall be provided. Such safeguards are not required to be included in the union's constitution and bylaws, but they must be observed. A labor organization's wide range of discretion regarding the conduct of elections is thus circumscribed by a general rule of fairness.

*Accord, Reich v. Federation of Catholic Teachers*, 853 F. Supp. 710, 714 (S.D.N.Y. 1994) (*citing*

29 C.F.R. § 452.110 with approval); *Graphic Arts Int'l Union*, 118 L.R.R.M. at 2096 ("fundamental precepts of fairness . . . which the LMRDA was designed to assure."). Furthermore, § 452.110(b) specifies that the "union's failure to provide voters with adequate instructions for properly casting their ballots" may be a violation of the adequate safeguards requirement. 29 C.F.R. § 452.110(b).

The adequate safeguards provision has applied broadly to overturn elections in a variety of situations related to the procedural and mechanical aspects of conducting an election. *See, e.g., Wirtz v. Local 1622, Carpenters,* 285 F. Supp. 455 (N.D. Cal. 1968). Courts have found violations where the union did not provide voters with adequate instructions or notice about when or how to properly cast their ballots. *See Brock v. District 6, United Mine Workers of Am.*, 772 F.2d 905, 1985 WL 13586 (6th Cir. Aug 9. 1985) (unpublished disposition) (union's election notice was misleading because it gave impression that the polling hours were for all locations when those hours only applied to a few); *Acosta v. Local 41, International Brotherhood of Teamsters (IBT Local 41),* 2020 WL 11563944, at *3 (W.D. Mo. 2020) (unpublished disposition) (finding no "genuine issue of fact as to whether 'intelligible instructions' were provided" where a printing error on a return envelope caused voted ballots to be returned to voters); *Graphic Commc'ns Int'l Union,* 722 F. Supp. at 785 (Court entered summary judgment for DOL finding that the union unreasonably refused to count votes that had been mailed back in bulk because there were no instructions indicating that bulk mailing was prohibited or would result in ballots being voided).

Here, the Union first sent ballot packages including a business reply envelope for members to return their ballots which had the member's information pre-printed in the return address space. Answer, ¶29. The duplicate ballot packages contained business reply envelopes that were not pre-printed with the member's return address. Answer, ¶30. The voting instructions in the duplicate

ballot packages did not tell voters that they needed to write their return address on the business reply envelope. Answer, ¶31, 32; Ex. E. It is undisputed that the voting instructions did not explain why the inclusion of the member's name was necessary nor did it explain that if a voter failed to include their name and return address on the business reply envelope the ballot would be voided. Answer, ¶33; Ex.E. The Union failed to provide voters with adequate instructions for returning their voted ballots, resulting in 13 members having their ballot voided.

This case is similar to *Graphics Commc'ns Int'l Union* where the union invalidated ballots that were returned in a bulk mailing. 722 F.Supp. at 782. The union in that case argued that instructions were clear regarding the requirement that voters cast their votes individually. *Id.* at 785. That court, however, found that there were no instructions at all that would indicate to members that their ballots would not be counted if returned in a bulk mailing and it was therefore an unreasonable deprivation of the members' right to vote under section 401(e) for the union to refuse to count those ballots. *Id.*

The nature of the violation alleged in the present case is somewhat different in that the Department is not arguing that the Union violated the LMRDA by its refusal to count the ballots without return addresses; rather that the Union's failure to provide adequate instructions resulted in voters improperly casting their ballots. The Election Committee believed that it should have been common sense for voters to put their return address on the business reply envelope. *Id.* ¶ 27. Common sense also dictated that the Union should have informed members ahead of time that if they did not put a return address on their ballot, it would not be counted. In addition, because the LMRDA requires that elections be conducted by secret ballot, it is not unreasonable to think that voters may have believed the return ballot envelope intentionally did not include their name and address, or any lined area which might encourage a voter to include a name and return address.

Ex. F. Additionally, it is not a requirement to include a return address when sending mail through the USPS. *Supra,* Fn. 1. And notably, the Department's publicly available sample mail ballot voting instructions include instructions for the voter to print their name and address on the return ballot envelope. *See Conducting Local Union Officer Elections* (July 17, 2020), https://www.dol.gov/agencies/olms/compliance-assistance/publications/guide-for-conducting-local-union-officer-elections#mail ("Insert the sealed Secret Ballot Envelope containing your marked ballot into the return envelope pre-addressed to the Local 999 Election Committee and seal it. Print your name and address in the return address space on the return ballot envelope.").

Without adequate, clarifying instructions, it would not be unreasonable for voters to send back their voted ballots in the return envelope as they received it. Because of the Union's failure to provide such instructions, 13 members in good standing had their ballots voided. Collectively, the Union's Title IV violations denied at least 21 members their statutory right to vote in the officer election.

### V. The Violations May Have Affected the Outcome of the Election.

Section 402(c) of the Act requires that the district court "shall declare" a contested election void and order a new supervised election if the Secretary proves by a preponderance of the evidence that a violation of Section 401 "may have affected the outcome of [the] election." 29 U.S.C. § 482(c); *Local 6*, 391 U.S. at 506-507. The Supreme Court held that once the Secretary establishes a violation of Section 401, she has established a prima facie case that the violation may have affected the outcome of the election and the burden of proof shifts to the union. *Local 6*, 391 U.S. at 492; *Usery v. Stove, Furnace, & Allied Appliance Workers Int'l Union of N. Am.*, 547 F.2d 1043, 1046 (8th Cir. 1977); *Marshall v. Office & Prof 1 Employees Union, Local 2*, 505 F. Supp. 121, 122 (D.D.C. 1981). The union has a "very substantial burden" of demonstrating by a

preponderance of the evidence that the violation either did not affect the outcome, or it was impossible for the violation to have affected the outcome. *Usery v. Int'l Org. of Masters, Mates and Pilots*, 422 F. Supp. at 1226 (S.D.N.Y. 1976). For the evidence produced by the union to be sufficient it must be both tangible and non-speculative. *Id.* Only if "there is no probability that the outcome of the election was affected by violations" should the election be allowed to stand. *Bachowski*, 413 F. Supp. at 150 (emphasis added).

Here, the Union denied at least 21 members the right to vote. The Union's failure to take reasonable steps to find new addresses for known undeliverable ballots resulted in 8 members not receiving a ballot. Additionally, the Union's failure to provide adequate voting instructions to members who received a duplicate ballot resulted in 13 members having their ballot voided. These 21 votes could have affected the races for President, Vice President, and Recording Secretary. Accordingly, pursuant to the plain statutory language, Plaintiff seeks the sole statutory remedy for these Title IV violations: a new election for each of these offices to be conducted under the Department of Labor's supervision. 29 U.S.C. § 482(c).

**Conclusion**

The Court should grant Plaintiff's Motion for Summary Judgment. The record contains ample, undisputed evidence to establish that Defendant violated sections 401(c) and 401(e) of the LMRDA and that these violations may have affected the outcome of the election. Plaintiff respectfully requests that this Court set aside the January 2023 election and require that Defendant conduct a new election for the offices of President, Vice President, and Recording Secretary under the Department's supervision.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By: s/ Craig A. Oswald
CRAIG A. OSWALD
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 886-9080
craig.oswald@usdoj.gov